1:12 MJ 3032

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

I, Charles Sullivan, a Special Agent of the Federal Bureau of Investigation, United States Department of Justice, hereinafter referred to as Affiant, being duly sworn under oath, hereby deposes and states as follows:

INTRODUCTION

1. Affiant is an investigative or law enforcement officer of the United States of America within the meaning of Title 18 U.S.C. § 2510(7) and Federal Rule of Criminal Procedure 41(a)(2)(C), as a Special Agent (SA) of the Federal Bureau of Investigation (FBI). Affiant is empowered to conduct investigations of and to make arrests for offenses enumerated in Title 18 U.S.C. § 2516.

2. Affiant has been employed as a Special Agent of the FBI since February of 1998 and has been assigned to the investigation of violent crime matters in the Cleveland Division, Painesville Resident Agency, for approximately the past seven years. Affiant has been charged with the investigation of Federal crimes involving bank robberies, drugs, weapons violations, interstate transportation of stolen property, crimes against children and other general criminal offenses in the Northern District of Ohio. At all times during the investigation described in this Affidavit, Affiant has acted in an official capacity as a Special Agent of the FBI.

3. Affiant has participated in all of the usual methods of investigation, including, but not limited to, physical surveillance, the questioning of witnesses, and the analysis of evidence. Affiant has written and/or executed search warrants resulting in the seizure of illegal weapons, drugs, stolen property and child pornography. Affiant has also supervised the activities of Confidential Human Sources (CHS).

4. This affidavit is being submitted in support of an arrest warrant for Chardee D. Barfield who knowingly transported an individual who had not attained the age of 18 years in interstate commerce, with intent that the individual engage in prostitution, in violation of Title 18, U.S.C., § 2423(a).

5. The statements contained in this affidavit are based in part on information developed by other Special Agents of the FBI, Officers from the Mentor Police Department and Officers from the Wickliffe Police Department, who have participated in the investigation of sex trafficking of a child. Unless otherwise noted, whenever in this Affidavit your Affiant asserts that a statement was made, the information was provided by another law enforcement officer or an investigator (who may have had either direct or hearsay knowledge of the statement) to whom your Affiant has spoken or whose report your Affiant has read and reviewed. Likewise, any information pertaining to vehicles and registrations, personal data on subjects, and record checks, has been obtained through the Law Enforcement Automated Data System (LEADS), various state driver's license motor vehicle records, online database searches or the National Crime Information Center (NCIC) computers, and various open source

databases such as LexisNexis.

6. Since the Affidavit is being submitted for the limited purpose of supporting the application in this matter, Affiant has not included each and every fact known to him concerning this investigation. Affiant has set forth only the facts that he believes are necessary to establish the probable cause for the issuance of the arrest warrant sought.

## FACTS AND CIRCUMSTANCES REGARDING PROBABLE CAUSE

7. On May 25, 2011, officers from the Mentor Police Department were dispatched to the America's Best Value Inn, 8370 Broadmoor Road, Mentor, Ohio 44060, regarding a theft complaint. Upon arriving at this location officers interviewed the complainant, Paige McLeod, a 27 year old female, and discovered that she had been conducting prostitution activities in a room at this motel. Officers interviewed McLeod who advised them that she had fallen upon hard times and was in need of money to support herself and her children. McLeod stated that she discussed her personal problems with two acquaintances, Ernest F. McClain, aka "Tubbs", and his girlfriend, Chardee D. Barfield, whom suggested to her that she begin prostituting herself with them. McLeod advised officers that "Tubbs" and Barfield "pimp" several girls, some of whom McLeod believed were less than 18 years of age. McLeod advised the officers that her clients, as well as other clients whom engaged in prostitution with other girls whom worked for "Tubbs", contacted the girls directly via an Internet web site. The girls then contacted "Tubbs" or Barfield who would rent a hotel room for them to utilize for prostitution purposes. "Tubbs" or Barfield would

then provide the hotel information (i.e. name of hotel, address, room number) to the girls who would then provide this information to the client in order to arrange a meeting. "Tubbs" and/or Barfield would then drop off the girls at the hotel and depart the area. After the girls engage in sexual conduct with the client and collected their money, they would contact "Tubbs" and/or Barfield who would return to the hotel to collect their share of the money. McLeod stated that "Tubbs" is extremely violent and will beat the girls who prostitute for him to ensure they will keep working as prostitutes for him. McLeod also stated that Barfield assists "Tubbs" with running the prostitution operation and she occasionally prostitutes herself as well. McLeod stated that "Tubbs" drives the girls to various hotels in his green colored Mercury Mountaineer.

8.	On December 5, 2011, CW#1, who was a 15 year old female, was dropped off at the West Haven Youth Shelter in Cleveland, Ohio. CW#1 advised the intake personnel at the shelter that she was a missing juvenile from Columbus, Ohio. CW#1 was subsequently interviewed by law enforcement officers and stated that in August of 2011 she met an individual from the Columbus, Ohio area by the name of "RICO". CW#1 originally met this individual over an internet chat line called "Urban Chat". After talking to "Rico" for several days she ran away from home in order to meet "Rico" in person. Shortly after meeting "RICO" he forced her to prostitute herself out of hotels in the Columbus, Ohio area. On a day in late September or early October 2011, while prostituting at the hotel, CW#1 was unable to find "RICO". CW#1 was informed by other girls at the hotel that "RICO" had been arrested for an unknown reason. While

walking around the hotel CW#1 was approached by an individual who called himself "Tubbs". CW#1 described "Tubbs" as a black male in his 30's. "Tubbs" asked her if she had been prostituting out of the hotel and she responded by telling him that she had been. "Tubbs" advised her that she could earn a lot more money prostituting herself in Cleveland, Ohio and he agreed to buy her a bus ticket so that she could travel from Columbus, Ohio to Cleveland, Ohio. A few of days later "Tubbs" provided CW#1 with a bus ticket, which she accepted, and rode a Greyhound bus from Columbus, Ohio to Cleveland, Ohio.

9. Upon arriving in Cleveland, Ohio CW#1 met with "Tubbs" who introduced her to his girlfriend, "Chardee" (Barfield). CW#1 stated that Barfield was also known as "Tubbs'" "bottom" which she defined as a female prostitute who was responsible for all the scheduling of the prostitutes and clients as well as the person whom collected the money for the pimp, "Tubbs". "Tubbs" originally promised CW#1 that for her acts of prostitution she would be able to keep 50% of all the money she earned, the other 50% being provided to "Tubbs". CW#1 stated that almost immediately after arriving in Cleveland, Ohio, "Tubbs" was prostituting her.

10. CW#1 advised that "Tubbs" would take digital photographs of her and post them on several web pages, including www.backpage.com, as an advertisement for CW#1 being available to meet clients to engage in prostitution. In these advertisements CW#1 would be forced to wear lingerie and would be prostituted under an alias name. In addition to CW#1, "Tubbs" was also prostituting other females. Some of the other girls whom were prostituted by "Tubbs" were Chardee, "Tubbs'"

girlfriend, who was also known by the alias names of "Erica" or "Seduction" and Brittany White, who was also known by an alias on the Internet. While posting these advertisements CW#1 recalled the contact number used was 216-848-xxxx which she believed was the cellular telephone number associated with Barfield.

11. Over approximately a 30 day period CW#1 was forced to prostitute, on average, 10 times per day. CW#1 estimated that "Tubbs" and Barfield forced her to engage in prostitution with over 200 males. The majority of the prostitution that CW#1 was forced to do occurred at different hotels that "Tubbs" and Barfield had rented. At times the hotel rooms were put in some of the girls' names, but never in CW#1's name because she was not old enough to rent a room. On occasion "Tubbs" and/or Barfield would drive CW#1 to clients' homes in order to engage in sex with them. CW#1 was not certain where she was every night but stated she was forced to prostitute east, west, and south of Cleveland, Ohio. On several occasions CW#1 had observed "Tubbs" being physically abusive towards Barfield. CW#1 was in constant fear of her safety and was forced to perform sex acts with "Tubbs" and Barfield. CW#1 stated that Barfield was enrolled at the Cleveland State University in the Criminal Justice program and would go to class on Tuesday and Thursday evenings. On those evenings Tubbs would force CW#1 to have sex with him. On several occasions he would tell her the sex act he wanted her to perform and she would perform it out of fear. On other occasions "Tubbs" would force her to submit to anal sex.

12. CW#1 believed that her photographs were maintained on several cellular telephones that "Tubbs" and Barfield had taken pictures of her with. In addition, "Tubbs" and Barfield utilized three laptop computers which also stored her digital photographs and were utilized to create the internet advertisements they would use to prostitute her.

13. CW#1 stated that the rate all the girls charged their clients was $100 for a half hour of sexual interaction with them or $180 for an hour of sexual interaction with them. Occasionally, "Tubbs" would run $50 or $60 specials. CW#1 recalled on several nights after being forced to have sex with 5 or 6 individuals the only thing she requested was a bath. "Tubbs" and Barfield advised her that she could not take a bath and provided her with a Summer Eve wipe or a douche and told her to get back to work.

14. During the interview of CW#1 she was asked to review several photographs and Internet advertisements. CW#1 positively identified herself as the individual in several of the photographs and was also able to positively identify McClain, aka "Tubbs", and Barfield from these photographs.

15. On 01/04/2012 CW#1 was interviewed again by law enforcement officers and advised that during December 2011, she, "Tubbs", Barfield and Brittany White (another prostitute whom worked for "Tubbs") all traveled together from Cuyahoga County Ohio to Pittsburgh, Pennsylvania in order to engage in prostitution. They all resided in Pittsburgh, Pennsylvania for a few days and CW#1 engaged in prostitution with approximately 10 clients while in Pittsburgh, Pennsylvania.

7

16. On January 3, 2012, Brittany White, a 21 year old female, was interviewed by law enforcement officers and advised that during August 2011 White initially met and befriended Chardee Barfield. As the two became acquainted with each other Barfield advised White that she was a student at Cleveland State University (C.S.U.), studying Psychology, and also worked as a prostitute for her boyfriend, Ernest McClain aka "Tubbs". Barfield explained to White that she could also work for "Tubbs" and she would be expected to evenly split (50%/50%) all of her earnings with "Tubbs".

17. White stated that Barfield took digital photographs of her (White) with Barfield's cellular telephone. Barfield would then download these images from her (Barfield) cellular telephone to a laptop computer in order to edit or "crop" the images. White stated that Barfield would then upload the digital photographs to the internet onto the web site www.backpage.com.

18. White stated that these photographs were uploaded to the Internet in order for White to advertise herself as a prostitute. White stated that in order to upload these images to the Internet, Barfield gained connectivity to the Internet via "free wi-fi" which was provided to occupants of various hotels which "Tubbs" or Barfield had rented rooms at.

19. During September 2011 White originally met CW#1 at the Ramada hotel in Wickliffe, Ohio. White stated that "Tubbs" brought CW#1 to her hotel room and introduced her as another person whom would be prostituting for him.

20. White stated that CW#1 utilized an alias name on the web site www.Facebook.com in order to advertise herself as a

prostitute. White also stated that CW#1 was usually with "Tubbs" and/or Barfield, having no other way to travel from one place to another and having no way to sustain herself without assistance from them. White stated that Barfield does not have a driver's license and she and CW#1 are driven from place to place by "Tubbs".

21. White stated that the hotel rooms where they prostituted themselves were usually paid for by "Tubbs" or Barfield. White stated that after the room was rented "Tubbs" or Barfield would provide her with the room number and a room key so that she could use the room for prostitution purposes.

22. White stated that during the time period between Christmas and New Year's 2011, she, "Tubbs", Barfield, and CW#1 traveled from the Cleveland, Ohio area to the Pittsburgh, Pennsylvania area in order to engage in prostitution. White stated that while they were in Pittsburgh, Pennsylvania they stayed at the "Days Inn" hotel in a room which had been rented by "Tubbs" or Barfield. White stated that they had all decided to travel from Cleveland, Ohio to Pittsburgh, Pennsylvania because they were not earning much money in Ohio prostituting themselves so they thought they may be able to earn more money prostituting themselves in Pennsylvania. White stated that they all traveled from the Cleveland, Ohio area to the Pittsburgh, Pennsylvania area together in "Tubbs'" vehicle (a green colored Mercury Mountaineer). White stated that "Tubbs" drove the vehicle, Barfield traveled in the front passenger seat while she and CW#1 traveled in the back seat. White stated that she, "Tubbs", Barfield and CW#1 stayed at a "Super 8" motel in Pittsburgh, Pennsylvania. When they arrived in the Pittsburgh,

1  Pennsylvania area they all got into an argument with each other so they only stayed in the Pittsburgh, Pennsylvania area for one night.

23. White stated that while they were in the Pittsburgh, Pennsylvania area Barfield re-posted her own, along with White's and CW#1's advertisements on the Internet indicating that they were now prostituting themselves in the Pittsburgh, Pennsylvania area. (Note: On 12/27/2011 CW#1's posting on the web site www.localescortpages.com indicated that CW#1 was prostituting herself in the Pittsburgh, Pennsylvania area. This posting was created via Barfield's cellular telephone) White stated that while they were all in the Pittsburgh, Pennsylvania area she met with two clients and engaged in prostitution activities while CW#1 had one client scheduled to meet her in order to engage in prostitution activities but this client never arrived.

24. White stated that on the return trip from the Pittsburgh, Pennsylvania area back to the Cleveland, Ohio area, she elected to travel by herself via a bus, and believed that "Tubbs", Barfield and CW#1 traveled from the Pittsburgh, Pennsylvania area back to the Cleveland, Ohio area together in "Tubbs'" vehicle.

25. White stated that all of "Tubbs'" prostitutes, including CW#1, charged the same amount of money to engage in sexual conduct with clients. White stated they all charged a client $100.00 for 30 minutes of sexual interaction with them or $180.00 for 60 minutes of sexual interaction with them. White stated that all of "Tubbs'" prostitutes provided him with 50% of their earnings.

26. White stated that Barfield utilized the cellular telephone number of 216-688-xxxx. White also stated that this was the cellular telephone number which CW#1 also used because CW#1 didn't have a cellular telephone of her own.

27. White stated that she was aware that CW#1 had engaged in prostitution with approximately 50 clients.

28. White believed that "Tubbs" and Barfield had both engaged in sexual conduct with CW#1.

29. On January 3, 2012 Ernest McClain, aka "Tubbs", was located, and arrested, by law enforcement officers at the Ramada hotel, 28600 Ridgehills Drive, Wickliffe, Ohio 44092. McClain was observed driving a green colored Mercury Mountaineer vehicle. McClain was charged with compelling prostitution and placed into the Wickliffe Police Department jail.

30. A search of LEADS for Chardee D. Barfield, date of birth August 7, 19xx, resulted in a match for an individual with a social security number 287-xx-xxxx. This query also revealed that Barfield resided at the same address as McClain.

31. Based on the information contained herein, there is probable cause to believe that Chardee D. Barfield did knowingly transport a individual who has not attained the age of 18 years in interstate or foreign commerce with intent that the individual engage in prostitution in violation of Title 18, USC, § 2423(a).

_____
Charles Sullivan
Special Agent
FBI

Subscribed and sworn to before me this ___30th___ day of January 2012.

_____
Gregory A. White
United States Magistrate Judge