1              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF OHIO
2                   EASTERN DIVISION

3    UNITED STATES OF AMERICA,        Case No. 1:12CR62-2
                                      Cleveland, Ohio
4              Plaintiff,             Monday, April 9, 2012
                                      12:25 p.m.
5         vs.

6    CHARDEE BARFIELD,

7              Defendant.

8
                     TRANSCRIPT OF PROCEEDINGS
9            BEFORE THE HONORABLE DAN A. POLSTER
                UNITED STATES DISTRICT JUDGE
10
                     **DETENTION HEARING**
11

12   APPEARANCES:

13   For the Government:        Michael A. Sullivan,
                                Assistant United States Attorney
14
     For the Defendant:         Edward G. Bryan,
15                              Assistant Federal Public Defender

16

17

18

19

20

21   Court Reporter:           Bruce A. Matthews, RDR-CRR
                                Chief Court Reporter
22                              United States District Courthouse
                                801 West Superior Avenue
23                              Cleveland, Ohio    44113
                                (216) 357-7207
24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer-aided transcription.

1          THE COURT:  All right.  We're here on case

2    1:12CR62, United States versus Chardee D. Barfield.

3    Ms. Barfield is here with her attorney, Mr. Bryan.

4    Mr. Sullivan is here for the government.  Ms. Evans is here

5    from Pretrial Services.  We're here for a detention hearing.

6          So I take it all sides are ready to proceed, so

7    Mr. Sullivan?

8               MR. SULLIVAN:  Thank you, Judge.  United

9    States calls Charles Sullivan.

10               THE COURT:  Sir, if you could raise your right

11    hand.

12               CHARLES SULLIVAN, of lawful age, a witness called

13    by the Government, being first duly sworn, was examined and

14    testified as follows:

15          DIRECT EXAMINATION OF CHARLES SULLIVAN

16    BY MR. SULLIVAN:

17    Q.    Good morning.  Please state your name and spell your

18    last name for the record.

19    A.    Charles Sullivan, S-U-L-L-I-V-A-N.

20    Q.    By whom are you employed?

21    A.    I'm a Special Agent with the Federal Bureau of

22    Investigation.

23    Q.    How long have you been so employed?

24    A.    14 years.

25    Q.    Are you familiar with the facts and circumstances

1    regarding the investigation and arrest of Chardee Barfield?

2    A.    I am.

3    Q.    All right.  And in the course of this case, did you

4    prepare an affidavit in support of a criminal complaint

5    charging Ms. Barfield with a crime?

6    A.    Yes, I did.

7    Q.    All right.  And have you had an opportunity to review

8    your affidavit?

9    A.    I have.

10   Q.    And as you sit there today, do you reaffirm the facts

11   as stated in that affidavit?

12   A.    I do.

13   Q.    All right.  And do you recall was there also a time

14   that Ms. Barfield was indicted along with co-defendant

15   Ernest McClain?

16   A.    Yes, she was.

17   Q.    And was an arrest warrant issued with that indictment?

18   A.    Yes, there was.

19   Q.    Do you recall approximately when that was?

20   A.    February 2nd of 2012.

21   Q.    And from that time did you make some efforts to locate

22   Ms. Barfield?

23   A.    Yes, I did.

24   Q.    All right.  And can you just briefly summarize some of

25   those efforts?

1   A.    I've been in contact with several of her family

2   members over the phone, as well as in person.  I've

3   conducted surveillance outside of homes of her family

4   members and friends, and we have, through the public

5   relations department of the FBI, we have put out

6   notifications asking for assistance from the public through

7   the media.  It's been on the website and it's also been on

8   news media boards throughout Greater Cleveland, Ohio, as

9   well as Columbus, Ohio.

10  Q.    So did those billboards include a picture of

11  Ms. Barfield?

12  A.    Yes, it did.

13  Q.    So her picture and information about her on

14  billboards?

15  A.    That's correct.

16  Q.    As well as on some news media outlets?

17  A.    That's correct.

18  Q.    All right.  And do you know if you or if other agents

19  with the FBI prior to Ms. Barfield being indicted had ever

20  been in contact with her?

21              THE COURT:  You mean during the investigation?

22              MR. SULLIVAN:  Yes.

23  Q.    During the investigation, do you know if other agents

24  had spoken to Ms. Barfield?

25  A.    I know the police departments have when she's been

1     arrested for prostitution in regards to -- or in relation to

2     this case in the past, yes.

3     Q.    All right.  And do you know if the agent -- if other

4     agents on the violent crime squad had Ms. Barfield's

5     telephone number?

6     A.    Yes, they did.

7     Q.    All right.  And do you know if there were efforts made

8     to call her on that cell phone?

9     A.    Yes, there were.

10    Q.    And did she respond at all after the warrant was

11    issued?

12    A.    No, she did not.

13    Q.    Did there come a time when Ms. Barfield was arrested?

14    A.    Yes, there was.

15    Q.    When was that?

16    A.    Last Tuesday, April 3rd of 2012.

17    Q.    And do you know where she was arrested?

18    A.    In the vicinity of 2020 West 47th Street in Cleveland.

19    Q.    And do you know, was it at a residence?

20    A.    She had just departed a residence, yes.

21    Q.    And do you know whose residence it was?

22    A.    It was a friend of hers.  His first name is Rob.  I

23    don't remember his last name.

24    Q.    Okay.  After she was arrested, do you know if

25    Ms. Barfield was informed of her constitutional rights as

Sullivan - Direct

1    far as police questioning?

2    A.    Yes.  I advised her.

3    Q.    You did?

4    A.    I did.

5    Q.    Okay.  And she appear to understand those rights?

6    A.    Yes, she did.

7    Q.    Did she waive those rights?

8    A.    Yes, she did.

9    Q.    Did she agree to talk to you?

10   A.    Yes, she did.

11   Q.    All right.  Can you tell us what the conversation

12   entailed?

13   A.    At the beginning of the conversation, we started with

14   a little bit of background information on her, where she was

15   born and where she went to school, that kind of stuff.  We

16   also talked about her employment.  She essentially met

17   Mr. McClain about three and a half years ago.

18         She was employed as a stripper on the east side of

19   Cleveland.  She befriended a couple of prostitutes that she

20   worked -- at least one of the prostitutes that she worked

21   with at that strip club.  About a year and a half ago, she

22   began prostituting herself to raise money for her and

23   Mr. McClain to sustain themselves.

24         They resided at the 857 East 128th Street, and that's

25   the residence of Mr. McClain's mother.  That house

1    eventually got foreclosed on, and they have been homeless

2    since that time, about a year and a half.  About that time

3    show began prostituting herself to raise money.  She had

4    been living out of his sports utility vehicle, as well as

5    hotels throughout the area.

6         She, you know, befriended a couple of people and

7    recruited them into the organization of Mr. Barfield, to

8    prostitute for him as well as her.  Those were the funds

9    they lived off of to sustain themselves.  She said in about

10   November of last year, she met a female she referred to as

11   Little Bit, that's --

12   Q.   I'd ask for you not say her actual name.  Is that the

13   minor you've --

14   A.   That's correct.

15   Q.   So I would ask for the name to be sealed.  But did she

16   refer to the person you know to be the minor who is the

17   subject of the indictment?

18   A.   Yes, she did.

19   Q.   Did she refer to her as Little Bit?

20   A.   Correct.

21   Q.   All right.  So if you can just refer to her as Little

22   Bit, if you can continue?

23   A.   Okay.  Little Bit had told her that she was originally

24   from Illinois and she eventually was in Columbus, and that's

25   where she believed Mr. McClain had met her.  She met her in

Sullivan - Direct

8

1    Cleveland at about that time.  For a while they were

2    disjointed.  She didn't know where Little Bit had gone.  She

3    believed it was back to Columbus.  She was not aware whether

4    or how Little Bit traveled from Columbus up to Cleveland,

5    either through her own means or through some support through

6    Mr. McClain, but eventually she became one of the group.

7    She associated with them pretty much on a 24/7 basis.

8         They prostituted themselves, each one of them

9    essentially earning their money through prostitution.  She

10   indicated that the funds that she earned, she did not split

11   with Mr. McClain, but all the other prostitutes that worked

12   for them had individual agreements in regards to what

13   proceeds they would split with Mr. McClain.  Usually it was

14   50 percent.

15        Ms. Barfield indicated that she bought a laptop

16   computer for them to -- she would take pictures of the

17   prostitutes who worked for them.  She would, either through

18   her cell phone or with a digital camera, put those pictures

19   on a laptop computer, and she used the laptop computer to

20   crop the images and post them on different websites

21   indicating that these girls, as well as herself, as well as

22   Little Bit, were in different areas of Cleveland

23   prostituting themselves.

24        She also indicated that during December, I think it

25   was December 15th, she had a final exam at Cleveland State

1    University.  It was sometime after that time but before

2    Christmas that she, Little Bit, Ernest McClain and another

3    prostitute by the name of Brittany White, all traveled from

4    Cleveland, Ohio to Pittsburgh, Pennsylvania in order to

5    prostitute themselves.

6         Ms. Barfield indicated that the -- all of the

7    prostitutes reposted their own advertisements when they got

8    there indicating that they were available for prostitution

9    in Pittsburgh.  They stayed for just a day or two and then

10   came back.

11        She indicated it was her idea to go out to Pittsburgh

12   because she wanted to attend a prostitution party that was

13   hosted by the indi.com website, and that hotel was in

14   downtown Pittsburgh.  The hotel they stayed was -- she

15   didn't know exactly what city or which hotel it was, but she

16   said it was in Pennsylvania somewhere north of Pittsburgh.

17   And they returned -- I believe they were here for Christmas.

18   That's about the -- no.

19        She also indicated that she would take pictures of all

20   the prostitutes.  She indicated all the prostitutes would

21   take pictures of each other.  She indicated that she would

22   purchase the lingerie-type of clothing that she as well as

23   the other girls would wear.

24        She indicated that her credit card would be used to

25   gain subscriptions to the various websites that they could

Sullivan - Direct

10

1    post their pictures to for prostitution purposes.

2         She indicated that -- what else did we talk about?

3    Digital cameras that they had, she would -- she indicated

4    that the pictures that they took were from digital cameras

5    or from her cell phone.  During the course of the

6    investigation, they were arrested and detained, and part of

7    those laptops were seized.  So then she just would use her

8    cell phone to take the pictures and upload them to the

9    Internet.

10        She indicated she was aware that the FBI was

11   conducting an investigation and looking for her.  She said

12   she saw her information about this case and about the FBI

13   wanting to arrest her on the website cleveland.com.  She

14   also indicated she intended to turn herself in, but she was

15   going to do that on her own terms, something to do with she

16   wanted to finish school, something to that effect.

17   Q.   All right.  And then did she also indicate that she

18   had any communication with Mr. McClain since she has been

19   indicted?

20   A.   Yes, she has.  She's been writing letters back and

21   forth to Mr. McClain while he's been in prison.

22              MR. SULLIVAN:  All right.  Thank you.  I have

23   nothing further.

24              THE COURT:  Any cross-examination?

25              MR. BRYAN:  Yes, Your Honor.

1          CROSS-EXAMINATION OF CHARLES SULLIVAN

2     BY MR. BRYAN:

3     Q.    For the record, Agent Sullivan, do you have a copy of

4     the statement that you took from Ms. Barfield?

5     A.    I do not.

6     Q.    Okay.  So, in essence, the testimony we heard

7     regarding her statement is what you remember from your notes

8     and remember from the interview itself?

9     A.    That's correct.

10    Q.    Okay.  Did you review your notes before coming to

11    court today?

12    A.    Yes, I did.

13    Q.    Sir, this investigation, the one involving

14    Ms. Barfield, actually began, at least according to your

15    affidavit, in the city of Mentor when the Mentor Police

16    Department received a call regarding a theft at a local

17    hotel?

18    A.    That's correct.

19    Q.    And when they arrived and they were talking to the

20    person who was accused of the theft, they interviewed a

21    Paige McLeod, a 27-year-old female?  This is based on your

22    affidavit.

23    A.    Yes, that's correct.

24    Q.    Okay.  And was she caught in the commission of a theft

25    act or something like that at the time and that's why the

Sullivan - Cross

12

1   police came to interview her?

2   A.    She had called the police to respond to her hotel room

3   in regards to what she portrayed was a theft, yes.

4   Q.    All right.  So she was the complainant in a theft act?

5   A.    That's correct.

6   Q.    Okay.  And who did she -- did she have suspects or did

7   she claim somebody had stolen from her?

8   A.    She had indicated that there were, I think it was

9   relatives or friends were in and out of the hotel, not all

10  of them that she recognized, and then some part of her

11  property had been taken.

12  Q.    All right.  So while the police were interviewing her

13  regarding her theft complaint, the subject matter then

14  turned to why she was at the hotel?

15  A.    That's correct.

16  Q.    And she had indicated that she had fallen on hard

17  times and was working as a prostitute to the hotel?

18  A.    That's correct.

19  Q.    And she voluntarily conveyed this to the Mentor Police

20  Department?

21  A.    That's correct.

22  Q.    And while she was discussing this with them, she

23  indicated who she had been working with, correct?

24  A.    That's correct.

25  Q.    That's when she first gave the name of Ernest McClain?

Sullivan - Cross

13

1    A.    That's correct.

2    Q.    And said that Ernest McClain, along with Ms. Barfield

3    and others, were engaged in prosecution in the -- I guess in

4    the Mentor area or in the Greater Cleveland area, correct?

5    A.    Our interest was and the information that came to us

6    was that not only was it prostitution, but it was

7    prostitution of a minor.

8    Q.    Okay.  Well, she specifically -- she didn't identify

9    the individual that you've referred to as Little Bit,

10   correct?

11   A.    Not at that time, no.  She indicated that this group,

12   Mr. McClain and Ms. Barfield, through the Mentor Police

13   Department, that's the information coming to me, did have

14   minor females working for them as prostitutes.

15   Q.    But she didn't specifically identify who the minors

16   were, but she felt some of the girls seemed young and could

17   be minors, correct?

18   A.    That's correct.

19   Q.    Okay.  But she didn't give you specific identification

20   of someone who was a minor?

21   A.    Not at that time.

22   Q.    Or that she knew to have been a minor?

23   A.    Not at that time in the investigation, not that I know

24   of, no.

25   Q.    Okay.  And then at some point during the investigation

1    in December of 2011, the minor in this case, the minor who

2    is the subject matter of this case, it indicates in your

3    affidavit was dropped off at the West Haven Youth Shelter in

4    Cleveland, Ohio?

5    A.    That's correct.

6    Q.    And that this individual at that time indicated how

7    she ended up in the Cleveland area and what she was doing

8    prior to that time, correct?

9    A.    That's correct.

10   Q.    Okay.  And this is the person whom you've referred to

11   as Little Bit, correct?

12   A.    Yes.

13   Q.    And this individual, at least according to your

14   affidavit, indicated that she was found herself in the

15   Columbus area first, correct?

16   A.    That's where she was currently residing, yes.

17   Q.    Okay.  But that while she was in the Columbus area,

18   she had run away from home prior to that?

19   A.    Yes.

20   Q.    And while in the Columbus area she met a person by the

21   name of Rico?

22   A.    Correct.

23   Q.    And this person by the name of Rico had been

24   prostituting her in the Columbus area, correct?

25   A.    That's correct.

1    Q.    Okay.  And this person by the name of Rico, has he

2    been identified by the FBI yet?

3    A.    There is an open investigation in the Columbus RA on

4    that individual, yes.

5    Q.    Okay.  And apparently this individual was not only

6    prostituting this individual, but there were other

7    individuals who was prostituting with this individual as

8    well?

9    A.    In Columbus?

10   Q.    In the Columbus area, correct?

11   A.    That I don't know.

12   Q.    But she indicates -- or you indicated in the affidavit

13   that she indicated to you that one day Rico turned up

14   missing and some of the other girls -- were the other girls

15   prostitutes?

16   A.    It's my understanding that the -- from what I wrote in

17   the affidavit, my understanding is that the other girls in

18   the hotel that were talking to Little Bit at that time were

19   prostituting at that hotel.  What they related to her or to

20   her group, that I don't know.

21   Q.    All right.  But they were prostitutes and they

22   indicated to her when she asked where Rico was, they

23   indicated that Rico had been placed under arrest for some

24   reason?

25   A.    That's correct.

Sullivan - Cross

16

```
1            THE COURT:  Why does this have anything to do
2   with whether or not I should detain Ms. Barfield?  I'm not
3   following the relevance here.
4            MR. BRYAN:  Well, I'll get to the relevance of
5   that.
6   BY MR. BRYAN:
7   Q.   At that time, then, she indicated that she was not
8   introduced, but she came into contact with Mr. McClain,
9   correct?
10  A.   Mr. McClain approached her in the hotel parking lot, I
11  believe, of that hotel.
12  Q.   Okay.  And this was in Columbus area?
13  A.   That's correct.
14  Q.   And she indicated that Mr. McClain was alone and that
15  Ms. Barfield or none of the other individuals were
16  Mr. McClain at that time, correct?
17  A.   That I don't know.
18  Q.   Okay.  And that he indicated that he -- if you want to
19  do this, you can do it in Cleveland and probably make more
20  money, correct?
21  A.   She indicated that from talking to him he told --
22  Mr. McClain told Little Bit that she could earn more money
23  working in Cleveland than she could in Columbus.
24  Q.   Okay.  And he gave her money for a bus ticket?
25  A.   As I understand, a couple days went by, and he
```

Sullivan - Cross

17

1    provided her with a Greyhound bus ticket to travel from the

2    Columbus area to the Cleveland area.

3    Q.    Okay.  So he did not bring her in his own vehicle.  He

4    gave money or gave her a Greyhound bus ticket to come to

5    Cleveland?

6    A.    At that time, correct.

7    Q.    Then she voluntarily on her own came to the Greater

8    Cleveland area, correct?

9    A.    How she got here, I don't know.

10   Q.    Okay.  Well, didn't she tell you that she rode the bus

11   to Cleveland?

12   A.    She rode a bus to Cleveland, yes.

13   Q.    Okay.  And that when she got here, that's the first

14   time she met Ms. Barfield, correct?

15   A.    That's correct.

16   Q.    And she explained to you that Ms. Barfield was

17   Mr. McClain's girlfriend?

18   A.    Yes.

19   Q.    And she also indicated that Ms. Barfield was engaged

20   in prostitution, as well?

21   A.    Say that again.

22   Q.    That Ms. Barfield was engaged in prostitution?

23   A.    That's correct.

24   Q.    That she was engaged in prostitution in the Greater

25   Cleveland area?

```
 1    A.    Yes.

 2    Q.    Okay.  And also through either this individual -- when

 3    she came forward at the children's shelter, she indicated

 4    that there were other people that worked with Ms. Barfield

 5    and Mr. McClain as well, correct?

 6    A.    Correct.

 7    Q.    And one of those persons was the person by the name of

 8    Brittany White, correct?

 9    A.    Correct.

10    Q.    And then the FBI conducted a sting where they in

11    essence arrested Brittany White, correct?

12    A.    No.

13                THE COURT:  I'd like to focus on something

14    that's relevant or else I'll end this, please.  The issue is

15    whether I should detain Ms. Barfield and what the evidence

16    is against her.  Let's focus on what I -- something that's

17    relevant to that or else I'll just conclude this.

18                MR. BRYAN:  Okay.

19    BY MR. BRYAN:

20    Q.    Eventually, you learned about Ms. Barfield through

21    these other individuals, correct?

22    A.    I don't understand your question.

23    Q.    Okay.  Well, the focus of the investigation turned not

24    only toward Mr. McClain, but turns toward Ms. Barfield as

25    well, correct?
```

Sullivan - Cross

19

1    A.    Eventually both of them, yes.

2    Q.    Okay.  And then there was an indication that there

3    were attempts to contact Ms. Barfield through a cell phone

4    number, correct?

5    A.    We had several cell phone numbers for her, yes.

6    Q.    Okay.  Were you part of those attempts or were those

7    other agents or other investigators?

8    A.    I was part of those attempts as well, as well as other

9    agents.

10   Q.    Okay.  Did you have telephonic contact with

11   Ms. Barfield prior to her indictment where you were just

12   trying to contact her as a witness?

13   A.    I did not, no.

14   Q.    Okay.  Did any other agent with your agency have

15   contact with Ms. Barfield prior to the time she was

16   indicted?

17   A.    Not that I'm aware of, no.

18   Q.    Did anyone from local law enforcement have any contact

19   with Ms. Barfield to say that they needed to discuss with

20   her the case prior to the time that she was indicted?

21   A.    Not that I'm aware of, no.

22   Q.    Are you familiar with the fact that Ms. Barfield had

23   contacted an attorney to reach out to law enforcement?

24   A.    I don't recall that, no.

25   Q.    Are you familiar with the attorney by the name of Ned

1    LaRue or Ed LaRue?

2    A.    The name sounds familiar.  I don't know how he's

3    related to the case.

4    Q.    Okay.  Are you aware that an attorney on behalf of

5    Ms. Barfield contacted law enforcement?

6    A.    No.

7    Q.    To inquire on her behalf?

8    A.    I am not.

9    Q.    Okay.  And you're not aware of that through any other

10    agents, as well?

11    A.    I'm not aware of that, no.

12    Q.    Special Agent Timothy Kolonic is a part of this

13    investigation?

14    A.    He assisted me in this investigation, yes.

15    Q.    Are you aware of whether or not Mr. LaRue had made any

16    contact with him?

17    A.    I don't know.

18    Q.    Okay.  But at some point in time a decision was made

19    to indict Ms. Barfield along with Mr. McClain, correct?

20    A.    Correct.

21    Q.    And none of the other adult prostitutes who are part

22    of this prostitution ring -- we've mentioned two already --

23    was a decision made to indict those other individuals,

24    correct?

25    A.    I don't understand your question.

Sullivan - Cross

21

```
 1    Q.    Well, Brittany White was an adult prostitute who was

 2    working along with Ms. Barfield, correct?

 3    A.    Correct.

 4    Q.    Okay.  She wasn't charged in this case, correct?

 5    A.    That's correct.

 6    Q.    And she wasn't -- she was -- she gave a statement to

 7    law enforcement prior to the indictment against

 8    Ms. Barfield, correct?

 9    A.    Correct.

10    Q.    And this Ms. McLeod, this 27-year-old prostitute, who

11    indicated that she was part of this group of prostitutes,

12    she wasn't charged in this case either, correct?

13    A.    Not the federal case, no.

14    Q.    And she gave a statement to law enforcement prior to

15    the indictment was returned as well, correct?

16    A.    Correct.

17    Q.    Now, based upon your investigation, do you know how

18    old Mr. McClain is?

19    A.    He's mid 20s.

20    Q.    Mid 20s or 30s?

21    A.    I thought it was his mid 20s.

22    Q.    Okay.  Do you know how old Ms. Barfield is?

23    A.    I think she's 22.

24    Q.    Okay.  And based upon your investigation, do you know

25    how long her and Mr. McClain have been together?
```

Sullivan - Cross

22

1    A.    She told me approximately three and a half years.

2    Q.    Okay.  So when she was around 18 or 19 years old?

3    A.    That's correct math, yes.

4    Q.    Okay.  And Ms. Barfield, when she was arrested and

5    when she was interviewed by you, she did give you a

6    statement, correct?

7    A.    Correct.

8    Q.    You indicated that that statement was voluntary?

9    A.    Yes.

10   Q.    And she indicated that she, in fact, was working as a

11   prostitute in the community, correct?

12   A.    That's correct.

13   Q.    And that she was working as a prostitute along with

14   some of the other witnesses that you had already testified

15   about, correct?

16   A.    Correct.

17   Q.    Including Brittany White?

18   A.    Yes.

19   Q.    Including this Ms. McLeod?

20   A.    Correct.

21   Q.    Okay.  And there were others who were involved as

22   well, correct?

23   A.    Yes.

24   Q.    And she in essence indicated that everyone sort of

25   like helped each other, and then they put the advertisements

1    online, correct?

2    A.    She indicated that she was the best with the

3    computers, so she was the one who did most of the putting

4    the advertisements online, yes.

5    Q.    So they would come to her and she would help them

6    upload or download advertisements online, correct?

7    A.    She would take pictures, other girls would take

8    pictures, and she was the one that was -- she took the most

9    pictures, and she says she's the best on the computer, so

10   she did most of the -- until the laptops were taken, she did

11   most of the cropping of the images and then posting them out

12   to the different websites, that's correct.

13   Q.    Then the advertisements were placed online and then

14   various appointments were made throughout hotels in the

15   Greater Cleveland area, correct?

16   A.    Cleveland and Pittsburgh, correct.

17   Q.    And then appointments would be fulfilled and then the

18   girls would get the money, and according to some of these

19   girls, they were giving half of the money to Mr. McClain?

20   A.    That's correct.

21   Q.    But they were keeping half of the money themselves,

22   correct?

23   A.    Correct.

24   Q.    Mr. McClain also considered himself someone who was

25   sort of the person who organized and helped set up

Sullivan - Cross

1    appointments and things like that as well, correct?

2    A.    Both Mr. McClain and Ms. Barfield would organize the

3    girls, the meetings with them.

4    Q.    And the girls would set up some of their own meetings

5    as well, correct?

6    A.    In this group, I don't know.

7    Q.    All right.  And Ms. Barfield indicated to you that as

8    it related to the juvenile in this case, she expressed to

9    you how she met her?

10   A.    She did.

11   Q.    And she said that she was introduced to her by Ernest

12   sometime in November of this past year?

13   A.    That's correct.

14   Q.    Okay.  And she also indicated to you that she was not

15   aware that she was a juvenile, correct?

16   A.    She stated that Little Bit had advised her that she

17   was 19.

18   Q.    So Little Bit said that she was 19 or otherwise said

19   she was an adult, correct?

20   A.    Correct, and Ms. Barfield told her -- or Ms. Barfield

21   advised me that she didn't believe her.  She said she acted

22   very immature.

23            THE COURT:  Say that again, please.

24   A.    Little Bit advised Ms. Barfield that she was 19 years

25   of age, and Ms. Barfield told me that she didn't believe her

1    because she said she acted immature.

2                    THE COURT:  That she acted immature?

3                    THE WITNESS:  That's correct.

4                    THE COURT:  Okay.

5    BY MR. BRYAN:

6    Q.    And just for the record, the minor is physically

7    mature, correct?

8    A.    I don't understand your question.

9    Q.    Well, she's physically developed.  She could be,

10   physically speaking, could be 19 or 20 years old?

11                   MR. SULLIVAN:  Objection.

12                   THE COURT:  Well, do you know?  Have you seen

13   the minor, this Little Bit?

14                   THE WITNESS:  I have never met her in person.

15   I have seen, you know, nude and, you know, lingerie-type

16   photographs of her.

17                   THE COURT:  Well, I guess if you can answer

18   the question based on that.

19   A.    She appears to be appropriate in age.

20   Q.    Okay.

21                   THE COURT:  What do you mean she appears to be

22   appropriate in age?

23                   THE WITNESS:  She doesn't look like she's 10,

24   but she doesn't look like she's 25.  I think she appears

25   appropriate for a 16-year-old girl.

```
 1              THE COURT:  Okay.

 2   BY MR. BRYAN:

 3   Q.    Now, as it related to Ms. Barfield and being under

 4   indictment, she did indicate to you that she was aware that

 5   she had been indicted, correct?

 6   A.    She indicated that the FBI -- she was aware that the

 7   FBI was seeking to arrest her.

 8   Q.    Okay.  And she also indicated to you that she had been

 9   a student at Cleveland State?

10   A.    She indicated that she got her -- she was a student at

11   Cleveland State.  She had gotten her GED, I believe, from

12   Tri C, and she had a degree in criminal justice from Bryan

13   Stratton College.

14   Q.    An Associate's Degree?

15   A.    That I don't know.  She said a degree.

16   Q.    But at the time the FBI was looking for her, she

17   indicated to you that she was enrolled at Cleveland State,

18   correct?

19   A.    She was enrolled at Cleveland State and she indicated

20   that.

21   Q.    And she indicated to you that she desired -- when you

22   said she was -- she said she was going to turn herself in

23   but she said she wanted to do it under her own terms, that

24   related to her schooling, correct?

25   A.    I believe that was the case, yes.
```

Sullivan - Cross

27

1    Q.    And that is that she had a couple of classes that she

2    was trying to finish before she turned herself in, correct?

3    A.    I don't know.

4    Q.    Did she indicate to you that she was taking -- that

5    some of the classes that she was taking through Cleveland

6    State, that she was submitting work online?

7    A.    I don't know that.

8    Q.    Okay.  But the bottom line is she wanted to take care

9    of some personal affairs, that being her school work, prior

10   to turning herself in, correct?

11   A.    I believe that's the case, yes.

12   Q.    Okay.  And since Ms. Barfield's arrest, have you had

13   the opportunity to speak with any of her family members?

14   A.    I have spoken with some of her family members.

15   Q.    Okay.  And have you spoken with her mother?

16   A.    I have.

17   Q.    Okay.  And have you spoken with her oldest sister?

18   A.    If that's the one here in court, yes, I have.

19   Q.    Okay.  And that sister is a principal in the Elyria

20   School District?

21   A.    I know it to be Lorain.

22   Q.    In Lorain, over in Lorain.  And Ms. Barfield's mother

23   indicated that she would like for her daughter to be able to

24   come home and stay with either her or one of the other

25   family members?

Sullivan - Cross

28

1    A.    That's not the conversation I had with her, no.

2    Q.    And the conversation you had with her mother and

3    sister concerned Mr. -- with Ernest, correct?

4    A.    No.  I had a conversation before Court today and

5    that's with regards to what they did on Easter weekend and

6    spending family time together.

7    Q.    All right.  So there was no discussion concerning this

8    case with her family members?

9    A.    There was discussion with regards to her family

10   members during this investigation, yes.

11   Q.    During this investigation?

12   A.    Uh-huh.

13   Q.    Prior to Ms. Barfield's arrest?

14   A.    I don't understand your questioned.

15   Q.    All right.  Well, since Ms. Barfield's arrest, have

16   you had conversation with her family members?

17   A.    I have.

18               MR. BRYAN:  Okay.  I have nothing further at

19   this time, Your Honor.

20               THE COURT:  Mr. Sullivan, anything further on

21   that?

22               MR. SULLIVAN:  No.  Thank you, Judge.

23               THE COURT:  All right.  You may step down,

24   sir.

25         (Witness excused.)

BRUCE A. MATTHEWS, RDR-CRR    (216) 357-7207

1           THE COURT:  Anything further from the

2    government.

3           MR. SULLIVAN:  No, Judge.  We just ask that

4    you accept the affidavit in support of the criminal

5    complaint.

6           THE COURT:  Well, I guess I'd like to see that

7    and I'll accept that.

8           MR. SULLIVAN:  That's an extra copy.

9           THE COURT:  All right.  Mr. Bryan, any

10   witnesses for you?

11          MR. BRYAN:  No witnesses, Your Honor.  I would

12   proffer at the appropriate time some evidence.

13          THE COURT:  What would you like to proffer?

14          MR. BRYAN:  Your Honor, on behalf of

15   Ms. Barfield today, present in court is her mother and her

16   sister and two of her brothers.  All have indicated a

17   willingness for Ms. Barfield to reside in their residences

18   if she were to be released on bond.

19       More specifically, I think the family feels that it

20   may be in everybody's best interest if she resides with her

21   brother, George, who is in the courtroom today, and I think

22   he had the opportunity to discuss this situation with

23   Ms. Evans from Pretrial Services.

24       Ms. Barfield's brother George is employed at Lincoln

25   Electric.  He lives in the area and lives with his

1    girlfriend and I think one small child -- two small

2    children, and indicates that his home is available for his

3    sister to be able to remain at if she were to be released on

4    bond with whatever conditions Your Honor would impose.

5         So that's my proffer, as well as the fact that her

6    family is here.  All of them are supportive of her and will

7    continue to support her while this case is pending.

8              THE COURT:  All right.  For brief argument,

9    Mr. Sullivan?

10             MR. SULLIVAN:  Thank you.  Judge, pursuant to

11   18 U.S. Code, 3142, there is a presumption for detention as

12   Ms. Barfield has been indicted for an offense both under

13   Section 1591 and under Section 2423, and both of those carry

14   a presumption for detention.  It would be the government's

15   position that that presumption has not been rebutted.

16   Indeed, that presumption has been strengthened and

17   reinforced during the course of this hearing.

18        The evidence has demonstrated that Ms. Barfield was

19   indicted on February 2nd.  There has been a warrant

20   outstanding for her for at least that time.  There was

21   actually a warrant a couple days before it, criminal

22   complaint, but the warrant -- on the warrant -- on the

23   indictment from February 2nd, she was aware that the FBI was

24   looking for her.  She voluntarily chose to avoid contacting

25   the FBI.  She was staying with a friend.  She would not

1    answer her cell phone calls from the FBI.

2         She did not -- she clearly was avoiding the FBI and

3    avoiding apprehension.  She indeed -- there's evidence that

4    she also was even in contact with the co-defendant, so she

5    has contacted the co-defendant, who's incarcerated.  She

6    knows the FBI was looking for her, and she made efforts to

7    avoid apprehension.

8         And as far as staying with her family, this is the

9    same family that Agent Sullivan says he was in regular

10   contact with while she was a fugitive, and obviously they

11   made no efforts to produce her or have herself turn herself

12   in.

13        Again, she was a fugitive for two months, and she was

14   apprehended through the investigation of the FBI.  She was

15   trying to avoid apprehension.

16        There's a presumption, we believe it's been

17   reinforced, and we would ask you to detain Ms. Barfield.

18             THE COURT:  Mr. Bryan, anything further

19   briefly?

20             MR. BRYAN:  Your Honor, we would also ask the

21   Court -- we would proffer the Pretrial Services report for

22   the record as well for the information that's contained

23   therein in addition to the proffer that I already made.

24        As it relates to the issue of bond, Ms. Barfield is 22

25   years old and has no prior criminal record whatsoever.  She

1    has literally, since early in her life, has struggled to do

2    things on her own behalf without trying to be a burden to

3    her family.

4        As it relates to being under indictment and the FBI

5    being in contact with her family, there's no evidence to

6    suggest that her family in any way harbored a fugitive or

7    helped her to evade capture or anything of that nature.  In

8    fact, the evidence presented from Mr. Sullivan is that she

9    was apprehended as she was leaving a friend's house, not a

10   family member's house.

11       Ms. Barfield is the youngest of, I believe, five

12   children -- youngest of seven children.  When she was 12

13   years old -- and I'm not sure that this was reflected in the

14   Pretrial Services report -- but when she was 12 years old,

15   she and her mother witnessed the death of her father who

16   suffered a heart attack in their presence, and since that

17   time things have been emotionally difficult for Ms. Barfield

18   as it related to her situation at home.

19       She was pretty much on her own, and by her own

20   choosing was out on her own as a young adult, but while out

21   on her own was able to enroll in college successfully, not

22   only first completing a GED program, but then successfully

23   completing an Associate's program at Bryant and Stratton and

24   then getting accepted and getting enrolled in Cleveland

25   State University, where she was a college student, a

1    successful college student as well, even while she was

2    living in a, I would suggest, a difficult set of

3    circumstances.

4        As it relates to her family, her family,

5    notwithstanding the fact that Ms. Barfield at a minimum was

6    involved in something that was illegal -- we're not

7    obviously conceding the charges in this case because

8    voluntarily engaging in prostitution is far different from

9    what Ms. Barfield is charged with in this case, which

10   carries with it a much more serious penalty and also carries

11   with it a greater burden on the government's part.

12       They have to prove that Ms. Barfield, a 22-year-old,

13   was either knowingly or was reckless in regards to the age

14   of the witness in this case who is alleged to have been a

15   juvenile.

16       Not only that, but they have to allege that

17   Ms. Barfield -- or they have to be able to prove that not

18   only was she reckless with regard to the girl's age but that

19   Ms. Barfield was actually the person who was using this

20   person in a prostitution ring.  They have charged her as

21   aiding and abetting.

22                THE COURT:  I understand, but this isn't the

23   trial.  Mr. Sullivan related an admission that your client

24   made which certainly goes a long way to showing that.  So

25   I've got to credit that.

1            MR. BRYAN:  Well, again, as Your Honor

2     rightfully pointed out, this isn't the trial.

3            But I think as it relates to whether or not she was

4     reckless as it relates to the age of this young lady, I

5     think there are going to be a lot of factors that would be

6     addressed at trial, including the appearance of the young

7     lady, including the activity that the young lady was

8     involved in prior to even meeting Ms. Barfield, including

9     representations that were made to Ms. Barfield and others,

10    which would go a long way in determining whether or not she

11    was reckless as it related to the young lady's age.

12           But in addition to that, they have to prove that she

13    did aid or abet, or -- you know, Mr. McClain.  Count 2

14    alleges that she transported.  There's no evidence that

15    Ms. Barfield was actually driving the vehicle or

16    transporting anybody now that the agent testified that this

17    is something that Ms. Barfield wanted to attend.

18           But, again, there are several elements that will be in

19    dispute at trial.  So the only reason I say that is because

20    it's not a -- it's not a *fait accompli* that Ms. Barfield

21    will be convicted.  She is presumptively innocent.  This is

22    a defensible case.

23           She is a person with no prior criminal record, with

24    significant family ties.  We believe that her significant

25    family ties, especially the fact that her family stands

1      behind her and are supportive of her, do rebut the

2      presumption in favor of detention in this case,

3      notwithstanding -- I would consider the unique set of

4      circumstances that led to her arrest.

5           Ironically, I think it's something that she wanted to

6      accomplish in a positive manner that caused her not to turn

7      herself in sooner than she did, and I can understand

8      somebody who's invested so much in their education, someone

9      who the pretrial services report reflects has over $30,000

10     in student loan debt, would want to try to finish out some

11     classes before she goes into custody so that all of the work

12     that she put forth in those classes wouldn't be for naught

13     and that the financial -- the financial aid and the

14     financial responsibility that she engaged in with those

15     classes wouldn't be all for naught, as well.

16          So in light of that, her age, and the fact that she

17     has no prior criminal record and she has significant

18     community ties and that this is a defensible case, we

19     believe there are conditions or combination of conditions

20     sufficient to warrant her release on bond pending a

21     resolution of this matter.

22          I don't know if the government argued that she was a

23     danger to community.  I don't think that's an issue at this

24     time.

25          I think obviously the main concern would be whether

1    she's a flight risk, and I think in light of the fact that

2    sort of the mystery behind the charges has been removed and

3    she understands what she's facing, she understands what her

4    possible defenses are, she understands what the potential

5    consequences are, and also because of the fact that she has

6    been able to present herself as an intelligent and rational

7    person in other settings, especially her education, that

8    that does rebut the presumption in favor of detention and

9    that there are conditions that would warrant her release at

10   this time.

11              THE COURT:  Thank you.  The Court has listened

12   carefully to the evidence, the testimony, the exhibits

13   proffered and the argument of counsel.

14        As Mr. Sullivan points out, there is a rebuttable

15   presumption in favor of detention here because of the nature

16   of the crime.  It's an extraordinary serious crime.  It puts

17   minors at risk.

18        I find the defendant has not rebutted the presumption

19   for the following reasons, and that she is a risk of flight

20   and a danger to the community.

21        First, the danger to the community is from the conduct

22   itself and her admissions that she played a part in it, she

23   engaged in prostitution herself, procured others, procured

24   the services of this one minor who told her that she was 19,

25   but Ms. Barfield said she didn't believe it, so that

1    suggests she knew that this individual was not 19 years old.

2         And the conduct is extremely serious.  It puts at risk

3    minors in this community and elsewhere.

4         Also, Ms. Barfield was a fugitive for almost two

5    months.  She admitted to Special Agent Sullivan that she

6    knew that the government was looking for her.  Law

7    enforcement contacted her family members.

8         Presumably those family members told Ms. Barfield that

9    the government was looking for her.  We're not talking about

10   a day or two.  We're talking about almost two months, and

11   Ms. Barfield did not turn herself in.

12        So I find that there's a likelihood that she'll flee,

13   particularly given that she's facing a mandatory ten-year

14   sentence if she's convicted in this case.

15        So both because of the statutory presumption, the

16   nature of the evidence, Ms. Barfield's admissions, the fact

17   that she was a fugitive for nearly two months and did not

18   turn herself in, I find that there are no circumstances,

19   conditions or combination of conditions that will both

20   protect the community and secure Ms. Barfield's appearance

21   in court, so she remains detained.

22        I believe we've set trial for June the 11th, is that

23   right, Robert?

24        Trial in this matter is Monday, June the 11th, at 9:00

25   o'clock.  There's a final pretrial conference Tuesday, June

1    the 5th, at noon.  Pretrial/change of plea conference, 10:30

2    on May the 29th.  And those dates stand.

3        Ms. Barfield is obviously joined with defendant

4    McClain, and those dates apply to him.  There's also a

5    status conference.

6        I see Mr. McGinty in the back.  I had set that for

7    April 30th, but I wanted to move that a day or two.

8        Let's make it --

9                MR. SULLIVAN:  Judge?

10               THE COURT:  Yes.

11               MR. SULLIVAN:  I know we originally said on

12   April 30th.  I'm actually out of town that week.  I set my

13   flight late enough so that I could leave after the pretrial

14   on the 30th, so I'll be gone the 1st, 2nd and 3rd.

15               THE COURT:  All right.  Well, we'll just leave

16   it then.  That's fine.  We'll just leave it for 11:00

17   o'clock on the 30th.  Okay.

18               MR. SULLIVAN:  Thank you, Judge.

19               THE COURT:  So I think I'll have that as a

20   status call for Ms. Barfield as well at 11:00 a.m. on the

21   30th.

22       Okay.  Anything further from either the government or

23   the defendant?

24               MR. SULLIVAN:  Nothing, Judge.

25               MR. BRYAN:  No, Your Honor.

1                    THE COURT:  Okay.  Then we're adjourned.

2           (Hearing concluded at 1:10 a.m.)

3                    C E R T I F I C A T E.

4

5                    I certify that the foregoing is a correct

6    transcript from the record of proceedings in the

7    above-entitled matter.

8

9                 S/Bruce A. Matthews        June 20, 2012
                  Bruce A. Matthews, RDR-CRR        Date
10

11

12
     DIRECT EXAMINATION OF CHARLES SULLIVAN          2
13   BY MR. SULLIVAN
     CROSS-EXAMINATION OF CHARLES SULLIVAN          11
14   BY MR. BRYAN

15

16

17

18

19

20

21

22

23

24

25